PAUL B. SNYDER
United States Bankruptcy Judge
1717 Pacific Ave, Suite 2209
Tacoma, WA 98402

✓ FILED
___ LODGED
___ RECEIVED

**March 17, 2009**

MARK L. HATCHER
CLERK U.S. BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
_____ DEPUTY

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>ALL AMERICAN BOTTLED WATER CORPORATION,<br><br>          Debtor. | Case No. 06-43133 |
| MICHAEL D. HITT, in his capacity as trustee for the bankruptcy estate of ALL AMERICAN BOTTLED WATER CORPORATION,<br><br>          Plaintiff,<br><br>      v.<br><br>BARNEY NG and JANE DOE NG, husband and wife; R.E. LOANS LLC, a California limited liability company; BAR K, INC., a California corporation; and PENSCO TRUST CO., a New Hampshire corporation,<br><br>          Defendants. | Adversary No. 08-04032<br><br>**MEMORANDUM DECISION**<br><br>**NOT FOR PUBLICATION** |

This matter came on for a two day trial on February 23 and 24, 2009, on a complaint filed by the Plaintiff, Michael D. Hitt, in his capacity as the trustee for the bankruptcy estate of All American Bottled Water Corporation (Trustee) against Barney Ng (Ng), R.E. Loans LLC

MEMORANDUM DECISION - 1

(RE Loans), Bar K, Inc. (Bar K) and Pensco Trust (collectively "Defendants"). At the conclusion of the trial, the Court took the matter under advisement. This Memorandum Decision shall constitute Findings of Fact and Conclusions of Law as required by Fed. R. Bankr. P. 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2).

I

**FINDINGS OF FACT**

A summary of the pertinent facts are as follows: All American Bottled Water Corporation (Debtor) purchased approximately 176 acres, commonly known in the community as the Olympia Brewery Property (Property), on April 1, 2004, for $14,000,000. The Debtor financed the purchase with two loans from RE Loans and Pensco Trust. RE Loans is a limited liability company operating as an "investment pool" drawing funds from private parties. Ng has no direct ownership interest in RE Loans. Pensco Trust is a company through which Ng maintains a self-administered retirement account.

The Debtor entered into a loan agreement with RE Loans, Pensco Trust and Ng dated March 29, 2004, to borrow the principal amount of $22,200,000 (Loan Agreement). Of this amount, $16,162,000 was made available to the Debtor at closing. An additional $888,000 was deposited into a deposit account at Mt. Diablo National Bank (Bank) and classified as an interest reserve representing four monthly interest payments. $2,650,000 designated as "points" was paid to Bar K and $1,850,000 in "points" was paid to Ng. The remaining $600,000 was paid as "points" to a broker, GSP, and $50,000 was paid to cover the lenders' legal and administrative expenses. The Loan Agreement further required the Debtor to execute three promissory notes, secured by deeds of trust, in favor of RE Loans, Pensco

MEMORANDUM DECISION - 2

Trust and Ng. The Debtor used the proceeds of this loan to close its purchase of the Property.

The March 29, 2004 Loan Agreement authorized the lenders to open a deposit account (First Account) at the Bank and required the Debtor to execute a Deposit Account Agreement. Paragraph 4 of this March 29, 2004 Loan Agreement provides: "To the extent that there are funds on deposit in the Account, Lender is hereby directed to pay the MONTHLY INSTALLMENT of interest that accrues on the Notes as and when the same becomes due and payable." The parties executed a Deposit Account Agreement dated March 29, 2004.

In July of 2004, RE Loans loaned the Debtor an additional $10,000,000 pursuant to a First Modification to Loan Agreement (First Modification). Out of the proceeds, Bar K received an additional $1,500,000 in "points" as loan servicing agent and mortgage loan broker for RE Loans, and GSP was paid $300,000 as the mortgage loan broker. RE Loans received $12,000 to cover its administrative expenses. The remaining $8,188,000 was placed in a deposit account (Second Account), and the Debtor was required to execute another Deposit Account Agreement. The parties executed a Second Deposit Account Agreement dated July 1, 2004. The First Modification required the Debtor to also execute a modification to the promissory note and deed of trust in favor of RE Loans to increase the loan amount.

Monthly interest was paid on the loaned funds from March, 2004 until May, 2006. The first four payments were drawn from the $888,000 interest reserve in the Deposit Account and the subsequent eight payments from the Second Account. When the funds in the Second Account were depleted, the Debtor tendered the interest payment for the next 16 months from other funds.

The Debtor subsequently defaulted on the loan payments and the Defendants initiated foreclosure proceedings. Trustee's sales were scheduled for dates in December, 2006, the first sale to commence on December 15th. An involuntary Chapter 7 petition was filed against the Debtor by three lien creditors on December 14, 2006. An Order for Relief on the involuntary proceeding was entered on January 12, 2007. The Defendants subsequently obtained an order granting relief from stay on January 23, 2008, that was later amended on February 15, 2008. A trustee's sale was subsequently held to foreclose the Ng Deed of Trust. Ng, or his successor in interest, was the high bidder at the sale.

The Trustee filed a complaint against the Defendants on March 28, 2008, for recovery of fraudulent transfers under RCW 19.40.041 and .051, breach of fiduciary duty, breach of contract/breach of the duty of good faith, breach of the Washington Consumer Protection Act, aiding and abetting breach of fiduciary duties by the Debtor's principal, L. Eric Whetstone (Whetstone), unjust enrichment/constructive trust, objection to claim, and equitable subordination. On February 12, 2009, the Court entered an order granting summary judgment in favor of the Defendants dismissing the Trustee's claims for breach of fiduciary duty, unjust enrichment/constructive trust, breach of the Washington Consumer Protection Act, and breach of the duty of good faith. The Trustee stipulated to the dismissal of the claims for aiding and abetting and equitable subordination. The parties agreed to hold the cause of action for objection to claim pending the resolution of the other claims.[1] The matter proceeded to trial on the Trustee's claims for recovery of fraudulent transfers under RCW 19.40.041 and .051 and the breach of contract claim.

---

[1] Based on this Memorandum Decision, the objection to claim appears to be moot.

MEMORANDUM DECISION - 4

**II**

**CONCLUSIONS OF LAW**

**A.    Fraudulent Transfer under RCW 19.40.041 and .051**

The Trustee alleges that the payment of points to Ng and Bar K is a fraudulent transfer as to present and future creditors under RCW 19.40.041 and as to present creditors under RCW 19.40.051.

The Trustee is not alleging actual intent to defraud. Under RCW 19.40.041(a)(2), a transfer is constructively fraudulent, without regard to a debtor's intent, if the debtor made the transfer without receiving reasonably equivalent value in exchange for the transfer, and the debtor:

> (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business transaction; or
>
> (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

RCW 19.40.041(a)(2).

According to RCW 19.40.051(a) a transfer is fraudulent as to a creditor whose claim arose prior to the transfer if the debtor did not receive reasonably equivalent value and the debtor was insolvent at the time of the transfer or became insolvent as a result.

The burden of proof rests with the party alleging a fraudulent transfer. Constructive fraud must be established by substantial evidence. Sedwick v. Gwinn, 73 Wn. App. 879, 885, 873 P.2d 528 (1994).

MEMORANDUM DECISION - 5

### 1. Single or Separate Transactions

The Trustee argues that in determining whether reasonably equivalent value was received, the Court must examine each transfer separately. Thus, in this case, the Court must examine separately whether the Debtor received reasonably equivalent value from Ng in exchange for the payment of $1,850,000 in points, and whether the Debtor received reasonably equivalent value from Bar K in exchange for the payment of $4,150,000 in points. The Defendants argue that the Court must instead evaluate the entire loan transaction as a whole.

This case raises an issue that has not been decided by Washington State courts. Courts recognize, however, that because the Uniform Fraudulent Transfer Act (UFTA) is a uniform act, cases construing 11 U.S.C. § 548, as well as cases interpreting other states' versions of the UFTA, are persuasive authority. Qwest Commc'ns Corp. v. Weisz, 278 F. Supp. 2d 1188, 1192 n.2 (S.D. Cal. 2003).

In support of his position, the Trustee primarily relies on the case of Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.), 256 B.R. 664 (Bankr. S.D.N.Y. 2000). The Court finds the facts and circumstances of Churchill to be distinguishable from the case before this Court. In Churchill, the chapter 7 trustee brought an adversary proceeding to recover as fraudulent transfers, commissions paid to brokers of an alleged Ponzi scheme. It was admitted that the brokers had no knowledge of the Ponzi scheme, that the services rendered in each specific broker transaction were equivalent to the services received, and that the brokers' own activities were not unlawful or wrongful in any respect. The premise of the trustee's argument was that the commissions were fraudulent simply because they were paid by an entity engaged in an illegal Ponzi scheme. Churchill, 256 B.R. at 674. The bankruptcy

MEMORANDUM DECISION - 6

court disagreed with the trustee and determined that upon the facts of that case, each transaction must be evaluated separately and dismissed the trustee's fraudulent conveyance claims based on a finding that the debtor received equivalent value for each specific transaction. Churchill, 256 B.R. 678-80.

Churchill is distinguishable primarily because, unlike the Defendants in this case, the brokers in Churchill admittedly had no relationship to one another, other than each providing services to an alleged Ponzi scheme. Additionally, there was no evidence that the brokers were aware that they were participating in a Ponzi scheme or that they had any knowledge of their involvement in a larger transaction, legal or otherwise. This Court agrees that under those circumstances it was proper to evaluate the transactions separately.

Although there is no Washington decision on point, courts from other districts recognize that it is proper under appropriate circumstances to evaluate a series of transactions as a whole in determining whether reasonably equivalent value was received. "Where an allegedly fraudulent transfer is merely one step in a general plan, the plan must be viewed as a whole with all its composite parts taken into consideration." See, e.g., Creditors' Comm. of Jumer's Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.), 338 B.R. 344, 356 (C.D. Ill. 2006), aff'd on other grounds, 472 F.3d 943 (7th Cir. 2007); Crown Paper Co. v. Fort James Corp. (In re Crown Vantage, Inc.), 2006 WL 2348850, at *2-3 (N.D. Cal. August 11, 2006) (court viewed series of exchanges taken in order to effectuate a spinoff together as one integrated transaction to determine whether reasonable equivalent value was received); In re Phar-Mor, Inc., 185 B.R. 497, 503 (W.D. Penn. 1995) (court treated two transactions as a single transaction to determine effect on the debtor).

The Trustee is correct that typically it is the plaintiff or trustee seeking to collapse multilateral transactions into a single transaction for the purpose of demonstrating that the insolvent debtor did not receive reasonably equivalent value for the transfer at issue. This does not mean, however, that the doctrine is not applicable to the converse situation. For instance, in Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.), 344 B.R. 340 (W.D. Pa. 2006), the unsecured creditors' committee sought to set aside a redemption of the debtor's stock as a fraudulent conveyance. The defendants, as in the case before this Court, asserted that the events culminating in the redemption must be viewed as a single integrated transaction, while the committee argued that the transfers must be viewed as separate and distinct. The United States District Court for the Western District of Pennsylvania agreed with the defendants and viewed the transaction as one integrated transaction. Nat'l Forge, 344 B.R. at 350. In making this finding, the District Court focused on the strong identity of interests among the relevant parties, timing of payments, intent of the parties to effect an integrated plan, and the fact that each critical step "would not have occurred on its own, but instead depended upon the occurrence of the others." Nat'l Forge, 344 B.R. 350.

Similarly, in Crown Vantage, the parties disagreed whether, in determining if the debtor received reasonably equivalent value in exchange for a transfer, the court should consider a series of exchanges taken to effectuate a spinoff separately, as the plaintiff argued, or as one integrated transaction, as the defendant argued. The United States District Court for the Northern District of California agreed with the defendants that where the parties "agreed that each such event must occur as a 'condition' to consummation of the agreement," the series of

MEMORANDUM DECISION - 8

exchanges must be viewed as one integrated transaction. Crown Vantage, 2006 WL 2348850, at *3.

As in Nat'l Forge and Crown Vantage, the Court concludes that the agreement to pay "points" to Ng and Bar K was part of an integrated transaction. The transfers to Ng and Bar K were negotiated as part of a single transaction for the loan of funds to the Debtor. Ng has submitted uncontroverted credible testimony that this was the parties' intent. The manner in which the transaction was structured supports his testimony.

When a transfer is one step in a general plan, the plan must be viewed as a whole with all its parts taken into consideration. The overall business plan in this case was to provide the Debtor with short-term funding needed to purchase the Property and begin the development of a water bottling plant. Each of the transactions at issue was integral to consummating that business plan. As with any loan, it carried with it attendant fees for services provided and to account for the risk of loaning funds assumed by the lender. One of the charges negotiated as part of the transaction in this case was the payment of points. Such charges were required by the lender as a cost of loaning the funds. All of the evidence indicates that if the Debtor was unwilling to pay such points, the loan would not have been funded. The parties did not negotiate an agreement to loan approximately $17 million in cash to the Debtor in March, 2004, and then another $8 million in cash in July, separate from the agreement to pay the $6 million to Ng and Bar K. The agreement to loan funds was clearly conditioned upon the payment of the points. Neither transfer would have taken place separately from the other. As such, the transactions were interrelated and constitute a single, integrated transaction. Under such circumstances, the Court cannot view the payments to Ng and Bar K in isolation.

MEMORANDUM DECISION - 9

Accordingly, the Court will view the transaction as a whole to determine whether the Debtor received reasonably equivalent value.

### 2. **Reasonably Equivalent Value**

In considering the transaction as a whole, the next issue is whether reasonably equivalent value was received by the Debtor. The question is not whether the Defendants gave reasonably equivalent value, but whether the Debtor received reasonably equivalent value. Broach v. Gen. Elec. Capital Auto Lease, Inc. (In re Lucas Dallas, Inc.), 185 B.R. 801, 807 (9th Cir. BAP 1995). The focus is whether the net effect of the transaction has depleted the bankruptcy estate. Sanders v. Cole (In re Viscount Air Servs., Inc.), 232 B.R. 416, 435 (Bankr. D. Ariz. 1998).

There was considerable argument in this case over the proper factors to consider in evaluating reasonably equivalent value. Although consistently urging the Court to treat each payment to Ng and Bar K as stand alone transactions, in the alternative, the Trustee maintained that the Court should compare the amount of the debt incurred as a result of the transfer to the actual cash received. The Defendants instead focused on a comparison of the value of the Property purchased with the loaned funds to the amount of cash received. The Court determines that reasonably equivalent value was received in this case under either analysis.

According to the Trustee, the Court should limit its focus to an evaluation of the cash received compared to the debt incurred. The Trustee argues that the Debtor received less than reasonably equivalent value for the transfer at issue because it only received approximately $25 million in cash in exchange for approximately $32 million in debt. However, the fact that a borrower receives less cash than the principal amount of a loan is not

necessarily determinative of a lack of reasonably equivalent value. If that were the case, as "there are always fees associated with the loan and the borrower never gets in cash the full amount it borrows," every loan transaction would be a fraudulent transfer. See Whitaker v. Mortgage Miracles, Inc. (In re Summit Place, LLC), 298 B.R. 62, 73 (Bankr. W.D.N.C. 2002). The Court must therefore take into consideration all aspects of the transaction, including all of the benefits, direct and indirect, received by the Debtor. See Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.), 945 F.2d 635, 646 (3rd Cir. 1991) (indirect benefits may be evaluated in determining whether reasonably equivalent value); Rubin v. Mfrs. Hanover Trust Co. (In re U.S.N. Co.), 661 F.2d 979, 993 (2d Cir. 1981).

The Debtor received significant intangible or non-monetary benefits from the loans at issue. The undisputed credible testimony is that the Debtor needed to acquire funds from an outside source to purchase the Property and begin the process of converting the former brewery into a water bottling plant. The funds were needed immediately, the Debtor was not able to or unwilling to commit any of its own funds towards the purchase, would not allow equity participation, and sought a nonrecourse loan. The Defendants were willing to loan the Debtor funds on such terms. The intent was for the Defendants to provide the Debtor with a short-term bridge loan until the Debtor was able to obtain alternative financing. Evidence was presented that the Debtor was actively seeking such alternative financing and that the parties expected that such funding would become available. As a result of the loan, the Debtor had the funding necessary to purchase the Property for a price of $14 million without utilizing any of its own funds. After deducting the cost of the Property, the Debtor also received approximately $11 million in cash. In addition to the cash received, this opportunity had value

in that had it been successful, would have provided significant monetary benefits to both the Debtor and the Defendants.

No evidence has been presented by the Trustee to establish that it was unreasonable or unusual for a lender under such challenging parameters to charge $6 million as a cost of loaning such funds. Ng testified that this was a typical transaction for him, that this is the first time such fees have been challenged, and that it was comparable to other financing arrangements he negotiated in similar situations, some of which had been specifically approved by other courts. Although other courts approval does not bind this Court on the issue of reasonably equivalent value, it is indicative of the reasonableness of the fees sought in the market place.

Additionally, there was no evidence presented to indicate that the Debtor was able to obtain financing on more favorable terms from a different lender, or that this was not an arms length transaction. As evidenced by the documents, the points at issue were a negotiated term between two sophisticated businessmen. The Defendants clearly bore substantial risks in this transaction. This risk was accounted for in the form of points paid to Bar K and Ng. The Trustee has failed to present any case law to say that reasonably equivalent value is not received merely because funds were paid to a third party, or because such funds were paid in the form of points. Presumably, the payment of points would not have been challenged if the $6 million had instead been paid directly to RE Loans. The $6 million paid to Ng and Bar K would also have been permissible, and exempt from a usury challenge, if instead received by the lenders in the form of a higher interest rate. See RCW 19.52.080, which creates an exception to the usury laws for business and commercial loans.

MEMORANDUM DECISION - 12

In other cases, courts have determined that similar fees do not necessarily render a transaction a fraudulent conveyance. For instance, in <u>Summit Place</u>, the lender charged a $100,000 "participation fee" for making a $265,000 loan. <u>Summit Place</u>, 298 B.R. at 67. At closing, only $143,844.52 was actually disbursed to the borrower. Among other causes of action, the chapter 7 trustee sought to avoid the transaction under 11 U.S.C. § 548(a)(1)(B) as a fraudulent transfer. The bankruptcy court determined that the transaction, "while extraordinary, was under all of the then current circumstances a valid arms-length business transaction" and that the "'participation fee' was high, but was a necessary inducement because the amount earned even at 18% for only ninety days would be so small as not to justify the risk of the loan." <u>Summit Place</u>, 298 B.R. at 68. As in <u>Summit Place</u>, this was a valid arms-length transaction and the points paid, although high, are justified in light of the circumstances of the loan. In comparing the debt incurred to the cash received, the Court concludes that reasonably equivalent value was received.

The same result is reached if the Court instead compares the value of the Property purchased with the loaned funds. The Court has difficulty with this method because the transfer challenged by the Trustee is the transfer of funds, not the grant of security. Although the Debtor utilized the loaned funds to purchase an asset, the Debtor received cash from the Defendants not the Property. On the other hand, the Court recognizes that the purchase of the Property was an integral part of this transaction. The funds at issue were loaned for the sole purpose of acquiring the Property and as start-up funds to begin conversion to a water bottling plant. In regards to at least $14 million of the funds, the Debtor could not have taken control of the funds and utilized them for other purposes. This amount went directly from the

MEMORANDUM DECISION - 13

Defendants into escrow, then to the seller to close the sale of the Property to the Debtor. The Court will therefore also evaluate reasonably equivalent value from this viewpoint.

The Court was presented with conflicting evidence regarding the value of the Property. The Defendants submitted the testimony of Ng indicating that it was his opinion that the Property and attendant water rights were worth substantially more than the original purchase price. According to Ng, it was his opinion that the Property was worth between $35 and $40 million. Although he is not a certified appraiser, the Court found Ng's testimony to be credible. Ng has been making business loans for over 30 years and has considerable experience in evaluating real estate in deciding whether to loan funds. His opinion of value is also substantiated by the Trustee's own earlier statements in opposition to the Defendants' motion for relief from stay valuing the Property at more than $58 million (Case No. 06-43133, Docket #99), and the fact that Miller Brewer Company (Miller) purchased this Property for $66 million in 1999 ($30 million in cash and $36 million in stock) and made over $42 million in capital expenditures while owner. Ng was also provided with a business plan prepared for the Debtor by George Smith Partners, Inc. dated March 1, 2004, which indicated that the assets acquired were worth substantially more than the $14 million purchase price. This business plan estimated that that the Debtor could receive over $18 million from the sale of unnecessary equipment and buildings alone during the first 12 months after purchase of the Property. Assuming that the Property was worth $35 million at the time of purchase, the Court agrees that reasonably equivalent value was received. Under this scenario, the Debtor received property worth $35 million and cash of approximately $11 million, for a total of $46 million, in exchange for a debt of $32 million.

MEMORANDUM DECISION - 14

On the other hand, the best evidence of value is typically the price paid for the property. In this case, simultaneous with the loan funding, the Debtor purchased the Property from Miller for $14 million. There is no evidence that this was not an arms-length purchase for fair market value. There is no allegation that Miller was having financial difficulties or needed to unload this Property quickly at a discounted price. However, even if the Court were to accept that $14 million is the best evidence of value, it concludes that reasonably equivalent value was received. Under this approach, the Debtor received real property worth $14 million and approximately $11 million in cash, or value of approximately $25 million. This then becomes the same argument previously advanced by the Trustee and addressed by the Court. Under this approach, the Debtor spent $14 million of the cash received to purchase an asset worth $14 million and $11 million in cash was remaining. Either way, the comparison is $25 million in assets as compared to a debt of $32 million. For the same reasons as stated above, the Trustee has failed to meet his burden of proof in establishing that this is not reasonably equivalent value when taking into consideration the circumstances surrounding the loan, i.e., 100 percent financing, short timeframe, no equity participation and nonrecourse.

If the transfer at issue is evaluated as a transfer for security, Washington State caselaw further supports a finding that reasonably equivalent value was received in this case. In Sedwick, the Washington State Court of Appeals recognized that "a transfer for security is ordinarily for a reasonably equivalent value notwithstanding a discrepancy between the value of the asset transferred and the debt secured, since the amount of the debt is the measure of the value of the interest in the asset that is transferred." Sedwick, 73 Wn. App. at 889 (quoting Unif. Fraudulent Transfer Act § 3 cmt. 3 (1984)).

MEMORANDUM DECISION - 15

Regardless of the actual value of the Property, the Debtor was able to effectuate its purchase and obtain almost $25 million in cash without utilizing any of its own funds. The Defendants, on the other hand, essentially advanced over $25 million of their own funds in exchange for a security interest in Property possibly worth no more than $14 million. The Defendants assumed nearly all of the risk in this transaction. No evidence has been presented by the Trustee to establish that it was unreasonable or unusual for a lender under such circumstances to charge $6 million in points as a cost of loaning these funds.

This is not the typical fraudulent conveyance case. What makes this case unusual is the fact that the Defendants and the transfer being challenged essentially created the estate. Prior to lending the funds, the Debtor apparently had no assets of any measurable value. It was the Defendants' actions and loan of funds that created an estate from which creditors could potentially seek payment. It is difficult to understand how estate creditors were potentially harmed by a transfer that created the estate itself. Based on all of the circumstances surrounding this transaction, the Court concludes that the Debtor received reasonably equivalent value for the transfer.

As reasonably equivalent value was exchanged, the Court need not reach the question of whether the transfer meets the other requirements for a fraudulent transfer.

### B. Breach of Contract

The Trustee argues that RE Loans and Bar K breached their contractual obligations to the Debtor in withdrawing $2,411,511 in interest from the Second Account without authorization.

The March 29, 2004 Loan Agreement expressly authorized RE Loans to withdraw interest payments from the Deposit Account. Paragraph 4 of that agreement provides: "To the

MEMORANDUM DECISION - 16

extent that there are funds on deposit in the Account, Lender is hereby directed to pay the MONTHLY INSTALLMENT of interest that accrues on the Notes as and when the same becomes due and payable." This provision is not contained in the First Modification.

The Trustee argues that RE Loans and Bar K breached the First Modification in deducting interest payments without express authorization, because RE Loans had contractually agreed to disburse the funds for the limited purposes identified. The First Modification provides in Paragraph 4: "The funds on deposit in the Second Account shall be disbursed by R.E. Loans in accordance with the provisions of this Agreement." As the First Modification does not contain a specific provision regarding the payment of interest, the Trustee argues that the withdrawal of such funds by R.E. Loans and/or Bar K was not in accordance with the provisions of that agreement.

In order to maintain a cause of action for breach of contract, the Trustee must establish that the contract imposed a duty, the duty was breached, and the breach proximately caused the damages. Nw. Indep. Forest Mfrs. V. Dep't of Labor & Indus., 78 Wn. App. 707, 712, 899 P.2d 6 (1995).

The Court concludes that the Trustee has failed to establish that the interest payments were unauthorized. The Trustee's only evidence of an alleged breach is the language of the First Modification itself. The language of this agreement, however, is not as clear as the Trustee alleges. Although the First Modification does not contain a provision specifically authorizing interest withdrawals, it likewise does not contain language specifically prohibiting the practice. The Court disagrees that the language stating therein that the funds on deposit "shall be disbursed by R.E. Loans in accordance with the provisions of this Agreement" are sufficient to establish a breach. This is particularly true in light of the only credible evidence,

MEMORANDUM DECISION - 17

stated below, indicating that such withdrawals were contemplated by and approved by the parties.

The primary goal in interpreting contracts is to ascertain the parties' intent. <u>Kenney v. Read</u>, 100 Wn. App. 467, 474, 997 P.2d 455, amended by 4 P.3d 862 (Wn. App. 2000). In discerning the parties' intent, courts may consider the subsequent conduct of parties and the reasonableness of their respective interpretations. <u>Berg v. Hudesman</u>, 115 Wn.2d 657, 668, 801 P.2d 222 (1990).

The intent of the parties that the Defendants be permitted to withdraw funds from the Second Account to cover monthly interest payments is evidenced by the agreement itself and the subsequent conduct of the parties. Paragraph 6 of the First Modification sets forth the purposes for which the Debtor is to utilize the funds in the Second Account. The parties specifically contemplated, as set forth in Paragraph 6, that over $1.2 million of the funds would be used for "Interest and Operating Capital." Even more compelling as evidence of the parties' intent is their subsequent conduct. The original Loan Agreement specifically authorized such payments, which were withdrawn from the $888,000 interest reserve account until depleted. When such funds were depleted, RE Loans withdrew the next eight interest payments from the Second Account. The funds on deposit in the Second Account were not sufficient to cover the full interest payment due March 1, 2005. Once the funds in the Second Account were depleted, the Debtor tendered a check to cover the balance owing on the March 1, 2005 payment of $124,488.08. This check is dated March 2, 2005, and was written out of a Charles Schwab account. A notation on the check indicates that it was for "March interest." The Debtor tendered funds to make the interest payments from another source of funds each subsequent month through May, 2006. During this entire two year period, there is no

indication in the record that the Debtor ever objected to the Defendants' withdrawal of funds. This lack of objection and the Debtor's tender of a check to cover the balance owing in March, 2005, evidences not only knowledge of the practice, but also consent. Ng further testified that it is his business practice to never withdraw funds from a borrower's account without obtaining prior consent. The Court found Ng's testimony to be credible, especially in light of the Trustee's failure to present any evidence to the contrary. The Trustee has failed to establish that the disbursements were unauthorized.

The Court agrees that the Washington Uniform Commercial Code (UCC) also permitted RE Loans to withdraw funds from this deposit account as a secured party. In the next sentence following the language relied on by the Trustee, the First Modification provides that:

> Until disbursed, these funds shall be deemed additional "Collateral," as defined by the security agreement provisions of the Deeds of Trust, securing the repayment of the Notes . . . . R.E. Loans shall have a first priority security interest in the entirety of moneys on deposit in the Second Account . . . .

The Trustee does not dispute that RE Loans held a valid security interest in the funds on deposit and that such funds were additional collateral for the loan. According to RCW 62A.9A-607(a), if so agreed, and in any event after default, a secured party:

> (5) If it holds a security interest in a deposit account perfected by control under RCW 62A.9A-104(a)(2) or (3), may instruct the bank to pay the balance of the deposit account to or for the benefit of the secured party.

RCW 62A.9A-607(a)(5).

RCW 62A.9A-104(a)(2) provides that a secured party has control of a deposit account if the parties have agreed in an "authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor." Both deposit agreements executed by the

MEMORANDUM DECISION - 19

Debtor and Bar K contain provisions by which the Debtor "irrevocably and unconditionally authorizes and instructs Bank to comply with any written demand from Lender for the release of funds on deposit in the Account."

Although a default had not been declared by the Defendants, withdrawal of the interest payments satisfies the requirements of RCW 62A.9A-607(a) in that it was consistent with the parties' agreement. As a secured party, the Defendants were within their rights to instruct the Bank to disburse interest payments to them out of the Second Account.

Lastly, the Trustee has failed to establish damages for breach of contract. It is undisputed that the amounts at issue were due and owing to the Defendants under the terms of the loan agreements. Any alleged damage to the Debtor in withdrawing the required interest payments, as opposed to exercising other remedies available to the Defendants if a default was declared, are speculative and unsubstantiated.

For the above reasons, the Court concludes that the Trustee has failed to establish a claim for fraudulent conveyance or breach of contract.

DATED: March 17, 2009

_____
Paul B. Snyder
U.S. Bankruptcy Judge

MEMORANDUM DECISION - 20